**NATURAL RESOURCES DEFENSE COUNCIL, INC., Environmental Defense Fund, Inc., and Alan G. Hevesi, Plaintiffs,**

v.

**Jeanne FOX, Regional Administrator, United States Environmental Protection Agency, Region II, Carol Browner, Administrator, United States Environmental Protection Agency, and United States Environmental Protection Agency, Defendants.**

No. 94 Civ. 8424(PKL).

United States District Court,
S.D. New York.

May 2, 2000.

Natural Resources Defense Council, Inc., New York City (Mark A. Izeman, Eric A. Goldstein, of counsel), for plaintiffs.

Mary Jo White, United States Attorney, New York City (Andrew W. Schilling, of counsel), for defendants.

## OPINION AND ORDER

LEISURE, District Judge.

This case involves the alleged failure for the past twenty years of the State of New York to establish pollution limits, known as total maximum daily loads ("TMDLs"), for waterbodies in the State. Plaintiffs bring

this action against the United States Environmental Protection Agency and two of its administrators (collectively, "EPA"), pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501, *et seq.*, alleging that in the face of New York State's failure to act, EPA has unlawfully failed to intervene and establish the TMDLs itself. Plaintiffs raise a number of related claims, including that EPA has acted arbitrarily and capriciously with respect to New York State's 1997 submission of proposed TMDLs for reservoirs that supply drinking water to New York City.

By Opinion and Order dated December 11, 1995, the Court ruled, *inter alia*, that (i) New York State's alleged failure to submit TMDLs could trigger nondiscretionary duties of EPA to intervene, and (ii) genuine issues of material fact exist as to whether certain of New York State's submissions to EPA constitute TMDLs, and, even if they do, whether EPA nonetheless must intervene. *See Natural Resources Defense Council, Inc. v. Fox*, 909 F.Supp. 153, 156–158 (S.D.N.Y.1995) [hereinafter, "*NRDC*"].

By Opinion and Order dated November 12, 1998, the Court granted partial summary judgment to defendants, dismissing all but one of plaintiffs' Clean Water Act claims, but denying summary judgment on plaintiffs' claims under the Administrative Procedure Act. *See Natural Resources Defense Council, Inc. v. Fox*, 30 F.Supp.2d 369 (S.D.N.Y.1998) [hereinafter, "*NRDC II* "]. Subsequently, the parties agreed to submit these remaining claims to the Court for final judgment. The parties' final briefs were fully submitted on April 9, 1999.

## BACKGROUND

The Court presumes familiarity with the discussion of the Clean Water Act's statutory scheme in its previous decisions in this action. *See NRDC II*, 30 F.Supp.2d. at 373–74; *NRDC*, 909 F.Supp. at 156–57. Accordingly, only those elements of the Clean Water Act pertinent to the motions presently before the Court are set forth here.

The instant case involves Section 303(d) of the Clean Water Act, which regulates waterbodies failing to meet water quality standards even upon application of so-called technological pollution controls. *See* 33 U.S.C. § 1313(d)(1)(A). States are required to create a prioritized list of such waterbodies, and, upon EPA's approval of the priority list, to establish TMDLs for each waterbody concerning pollutants specified by EPA. *See* 33 U.S.C. § 1313(d)(1)(A) & (C).

The Act prescribes the basic elements of a TMDL:

Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality.

*Id.* § 1313(d)(1)(C). EPA regulations further provide that a TMDL shall consist of the sum of: (i) the loading allotments for existing and future point sources of pollution[1] (known as "wasteload allocations"), and (ii) the loading allotments for existing and future nonpoint sources of pollution and natural background sources of pollution (known as "load allocations"). *See* 40 C.F.R. § 130.2(e)–(i).

The Act provides that states "shall submit" the prioritized lists of waterbodies and accompanying TMDLs "from time to time, with the first such submission not later than one hundred and eighty days after" EPA identifies relevant pollutants. *See* 33 U.S.C. § 1313(d)(2). The parties do not dispute that the states' initial TMDLs and lists of waterbodies were due on June 26, 1979. *See NRDC*, 909 F.Supp. at 157.

---

1. The Act defines a point source as "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

Upon receipt of lists and/or TMDLs, EPA "shall either approve or disapprove [them] . . . not later than 30 days after the date of submission." *Id.* § 1313(d)(2). Should EPA disapprove either a list of waterbodies or a TMDL,

[it] shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as [it] determines necessary to implement the water quality standards applicable to such waters. . . .

*Id.*

Principally at issue in the instant case is New York State's alleged failure to submit TMDLs to EPA for review. The Clean Water Act does not expressly address what duty, if any, EPA bears under such circumstances. *See id.* § 1313(d). This Court and others have read into the Act a requirement that EPA treat such state inaction as a so-called "constructive submission" of a deficient TMDL, triggering EPA's explicit mandatory duties under the Act to disapprove the "submission," *id.* § 1313(d)(2), and to establish TMDLs for the state, *id. See NRDC,* 909 F.Supp. at 157 (explaining doctrine and listing cases).

In *NRDC II,* the Court identified the issues to be decided in the final stage of this action, and in April 1999 the parties submitted the record upon which the Court will adjudicate plaintiffs' remaining claims. The administrative record ("AR"), dated January 8, 1998, consists of the evidence relied upon by EPA in its April 2, 1997, actions upon proposed TMDLs submitted by New York State, and provides the basis for the Court's review of plaintiffs' Claims Nine, Ten, and Eleven. The joint appendix ("JA") is a compendium of documents compiled jointly by the parties to assist the Court in its adjudication of Claims Six, Seven, Twelve, and Thirteen.

Of the thirteen claims enumerated in plaintiffs' Fourth Amended Complaint, only seven remain to be decided by the Court.[2] What had its origin as a Clean Water Act case is now primarily a suit under the Administrative Procedure Act. But while these APA claims are legally and analytically distinct from the original CWA claims, the underlying facts and plaintiffs' concerns remain the same. The Court briefly outlines these remaining claims.

Claims Six and Seven respectively seek judicial review under the APA of EPA's alleged failure "to formally disapprove New York State's TMDL submissions due from time to time," and its alleged failure "to formally establish and promulgate TMDLs applicable to WQLSs in New York State." Fourth Am.Compl. at ¶¶ 54–55.

Claim Nine seeks APA review of EPA's alleged failure "to disapprove facially-inadequate TMDLs for eight New York City reservoirs submitted by New York State to EPA on January 31, 1997." *Id.* at ¶ 57.

Claims Ten and Eleven allege, respectively, that EPA breached a mandatory duty under the Clean Water Act, and should be compelled to act pursuant to the APA, for its failure to "approve or disapprove purported TMDLs for 10 New York City reservoirs submitted by New York State to EPA on January 31, 1997." *Id.* at ¶¶ 58–59.

Claims Twelve and Thirteen allege, respectively, that EPA breached its mandatory duties under the Clean Water Act, and should be compelled to act pursuant to the APA, for failing since 1979 "to oversee and effectuate the § 303(d) program in New York State as set forth in paragraph[s] 28–37e of this [Fourth] Amended Complaint." *Id.* at ¶¶ 60–61.

Plaintiffs seek injunctive relief in the form of a "binding, but reasonable, sched-

---

**2.** In *NRDC,* the Court granted defendants' motion for summary judgment on Claim Five of the complaint, and dismissed Claims One and Two as moot. *See NRDC,* 909 F.Supp. at 161–62. In *NRDC II,* the Court granted defendants' motion for summary judgment on Claims Three, Four, and Eight. *See NRDC II,* 30 F.Supp.2d at 385.

ule for bringing Federal Defendants (and New York State) into compliance with the statutory scheme." Pls.' Br. at 65. More specifically, plaintiffs ask the Court for an order directing EPA: i) to establish TMDLs for all waterbodies on New York's 1998 § 303(d) list pursuant to a court-ordered timetable; ii) to promulgate TMDLs for the eight New York City reservoirs for which EPA has approved New York's proposed TMDLs; iii) to approve or disapprove the remaining ten reservoir TMDLs within 30 days of the entry of judgment in this case; iv) to review New York State's Continuing Planning Process; and v) to serve upon the Court and upon plaintiffs semi-annual progress reports regarding EPA's compliance with the proposed order. *See id.* at 68–69. Plaintiffs also ask the Court to retain jurisdiction over this case "for a period of time necessary to insure compliance with the above-sought relief, to consider any additional motions that may be brought, and to consider an application for an award of fees and costs." *Id.* at 69.

## DISCUSSION

### I. Standard of Decision

Pursuant to Fed.R.Civ.P. 52(a), the parties have filed cross-motions for final judgment on the pleadings now before the Court. Rule 52(a) permits the Court, with the consent of the parties, to decide a case without a formal trial "based on the record compiled in summary judgment proceedings." *Acuff–Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 142 (2d Cir.1998).

In *NRDC II*, the Court responded to plaintiffs' repeated suggestion that they were entitled to "trial" of their claims, noting that "a full trial may be inappropriate in the instant case," given the Supreme Court's directive that " 'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.' " *NRDC II*, 30 F.Supp.2d at 384 (quoting *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per

curiam)). The Court invited the parties to discuss whether plaintiffs' claims might be "the sort that can be decided based on final briefing by the parties incorporating references to relevant portions of the existing administrative record and, where appropriate, to supplementary affidavits or deposition excerpts from agency officials." *Id.* at 385.

Following discussions among the parties and a pre-trial conference before the Court, on December 30, 1998, the Court approved the parties' joint stipulation and scheduling order, memorializing the parties' agreement to submit these claims to the Court for final judgment, and establishing a briefing schedule pursuant to Fed.R.Civ.P. 16(b).

Although the Court has twice denied the parties' motions for summary judgment on the remaining claims in this suit, the Court applies a different legal standard to the cross-motions now before it. In considering the parties' earlier motions for summary judgment, the Court was bound to make all reasonable inferences in favor of the moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 128 (2d Cir.1996). In deciding the parties' cross-motions for final judgment, however, neither side enjoys such an advantage.

### II. Rights and Remedies upon Judicial Review of Agency Action

The Court makes a preliminary observation regarding the nature of remedies available to plaintiffs in a citizen suit for judicial review of administrative agency action. While a discussion of remedies may seem premature at this stage, prior to adjudication of plaintiffs' claims, the Court feels it is necessary to correct some misconceptions held by plaintiffs, and to establish a framework for addressing the merits of their claims.

In their papers, plaintiffs refer to questions of defendants' "liability." *See, e.g.,*

Pls.' Br. at 38–39. The Court must state at the outset that defendants cannot be, in any sense, "liable" to plaintiffs under the Clean Water Act or the Administrative Procedure Act, as neither statute provides plaintiffs with substantive rights. *See, e.g., Nebraska Health Care Ass'n. Inc. v. Dunning*, 575 F.Supp. 176 (D.Neb.1983) ("An agency's actions cannot violate this section; rather, they are to be reviewed under this section.") Plaintiffs have standing to petition for judicial enforcement of EPA's statutory duties, and the Court has jurisdiction to hear their claims. The Court's power in this context is limited, however, to vacating unlawful agency action and remanding to the agency for further proceedings, or compelling agency action that has been unlawfully withheld or unreasonably delayed. *See generally* 5 U.S.C. § 706. These considerations inform two critical issues in this case.

First, plaintiffs make frequent reference in their pleadings to the long history of failure by EPA and New York State to perform their duties under the Clean Water Act. Although evidence of this sort may be relevant to the reliability of these entities' promises of future compliance, plaintiffs are wrong to imply that recent efforts by EPA at compliance are *per se* insufficient to discharge EPA's statutory duties because of the agency's past failings. As the Court's sole power in this context is to require EPA to conform its present conduct to the law, EPA's past noncompliance is irrelevant to the question of agency's *present* compliance, and to whether the Court will grant the narrow relief prescribed by the CWA and the APA. Plaintiffs did not, and could not, acquire rights by virtue of EPA's past failings, and the Court cannot, accordingly, provide any relief that goes beyond ensuring EPA's present compliance with statutory mandates.

Furthermore, plaintiffs suggest that "issues of relief can be addressed separately from the issue of liability." Pls.' Br. at 38–39; *see also* Pls.' Repl.Br. at 34 ("[S]hould this Court find in Plaintiffs' favor on liabili-

ty, the parties should be directed to submit proposed final orders and schedules to this Court within 30 days, after consultation with one another and good faith efforts to come up with a mutually agreeable order and timetable.") Because liability is a concept foreign to judicial review of agency action, *see supra*, plaintiffs are clearly misguided in proposing that the Court make a generalized finding of "liability" and direct the parties to agree upon an appropriate remedy. If the Court finds that EPA failed to comply with either the CWA or the APA, the remedy is implicit in the breach: the Court must compel EPA's compliance with its statutory mandate.

With these considerations as a backdrop, the Court proceeds to consider the merits of plaintiffs' seven remaining claims in this action.

### III. Failure to Deem New York State's Alleged Inaction a "Constructive Submission" of Deficient TMDLs and to Promulgate Appropriate TMDLs

In Claims Six and Seven of their complaint, plaintiffs seek review under the Administrative Procedure Act, 5 U.S.C. § 706, of EPA's alleged failure to deem New York State's slow progress in promulgating TMDLs a "constructive submission" of deficient TMDLs, and its failure, in turn, to reject this deficient submission and promulgate its own TMDLs for the State.

Adopting the doctrine introduced by the Seventh Circuit in *Scott v. City of Hammond, Ind.*, 741 F.2d 992, 994 (7th Cir. 1984) [hereinafter, "*Scott*"], the Court in *NRDC* held that New York State's failure to submit proposed TMDLs to EPA in a timely manner could constitute a "constructive submission" of inadequate TMDLs, which in turn might trigger EPA's duty to intervene under the Clean Water Act.

In *NRDC II*, the Court dismissed plaintiffs' Clean Water Act claims on this issue,

concluding that EPA acted within its discretion under the CWA in not deeming New York State's TMDL activity a "constructive submission" of no TMDLs. *See NRDC II*, 30 F.Supp.2d at 377. Although the Court in *NRDC* made clear that the State's failure to promulgate TMDLs in accordance with the CWA would *eventually* trigger EPA's duty under the Act to declare a "constructive submission," the Court held in *NRDC II* that EPA retained discretion to determine at what point the State's intransigence was sufficient to require declaration of a "constructive submission." *See id.* at 376–78. Because the CWA does not require EPA to take such action by a date certain, or within a particular time frame, the Court found that EPA acted within its discretion under the Act in concluding that it was not yet required to declare a "constructive submission."[3]

The Court must now determine whether EPA's failure to declare a "constructive submission" by New York State, and ultimately to promulgate TMDLs in its stead, requires the Court to compel agency action under the Administrative Procedure Act. In *NRDC II*, the Court held that Claims Six and Seven properly state a cause of action under the APA, *see NRDC II*, 30 F.Supp.2d at 379, and denied defendants' motion for summary judgment on these claims. The Court observed, however, that recent progress made by New York State and EPA in developing TMDLs for the State was "certainly probative as to whether New York State has taken action sufficient to prevent EPA from being considered in violation of § 706." *Id.* The Court continued, "Assuming EPA's duty to intervene has been triggered, the nature and extent of that duty must be assessed in light of continuing developments, including progress in state efforts to submit TMDLs. It may be the case, for example, that sufficient state progress after a period of delinquency could reduce the extent of EPA intervention required or even render

the need for intervention altogether moot." *Id.* The Court must now decide whether EPA's omission to deem New York State's delay in promulgating TMDLs a "constructive submission" is arbitrary, capricious, or otherwise not in accordance with law, in contravention of 5 U.S.C. § 706(2)(A). *See* Fourth Am.Compl. at ¶ 54. The Court must also decide whether EPA unlawfully withheld or unreasonably delayed agency action, in contravention of 5 U.S.C. § 706(1). *See id.*

### A. Agency Action Arbitrary, Capricious or Otherwise Not in Accordance with Law

"Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706(2)(A)). To make this finding, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* Moreover, "[a]lthough this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* An agency action can be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 89–

---

**3.** In support of this holding, the Court observed that the Clean Water Act cannot possibly be said to impose a certain deadline on EPA, as the "constructive submission" doctrine exists solely by "judicial gloss" on the CWA. *See NRDC II,* 30 F.Supp.2d at 375–76.

90 (2d Cir.2000); *Henley v. FDA,* 77 F.3d 616, 620 (2d Cir.1996); *City of New York v. Shalala,* 34 F.3d 1161, 1167 (2d Cir.1994).

" 'The reviewing court must take into account contradictory evidence in the record, but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.' When an agency makes a decision in the face of disputed technical facts, '[a] court must be reluctant to reverse results supported by ... a weight of considered and carefully articulated expert opinion.' " *Cellular Phone Taskforce,* 205 F.3d at 89 (internal citations omitted). Plaintiffs bear the burden of overcoming the presumption of validity of EPA's actions. *See, e.g., Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981).

The Court made clear in *NRDC II* that New York State's failure to submit proposed TMDLs to EPA for approval would, after an unspecified period of time, trigger EPA's duty to declare a "constructive submission" of inadequate TMDLs by the State, and trigger EPA's further duty to approve or disapprove this "constructive submission" within 30 days. *See NRDC II,* 30 F.Supp.2d at 376–78; *see also* 33 U.S.C. § 1313(d)(2).

■ Defendants contend that because 5 U.S.C. § 704 allows review of "final agency action" only, EPA's alleged failure to act is unreviewable under the APA. Defendants make the syllogistic argument that the failure to perform an action is never final because there is always a possibility that it will be performed. *See* Defs.' Br. at 27. Defendants' argument has a surface appeal that disappears on further analysis of the language of the APA and judicial precedent. The APA itself includes "failure to act" in its definition of "agency action." 5 U.S.C. § 551(13). Moreover, the courts have held that agency inaction does, after some period of time, amount to final agency action. *See, e.g., Sierra Club v. Thomas,* 828 F.2d at 793 ("[A]gency inaction

may represent effectively final agency action that the agency has not frankly acknowledged"); *Public Citizen Health Research Group v. FDA,* 740 F.2d 21, 32 (D.C.Cir.1984) ("At some point administrative delay amounts to a refusal to act, with sufficient finality and ripeness to permit judicial review.") Thus, defendants cannot avoid judicial review with their "final action" defense.

■ On the merits of Claim Six, plaintiffs argue that, despite recent progress by EPA and the State in establishing TMDLs for New York, the State's failure to promulgate and submit TMDLs for EPA approval over the past two decades has undoubtedly triggered EPA's so-called "deeming duty," *i.e.,* the duty to declare a "constructive submission" of no TMDLs. Defendants maintain that EPA's "deeming duty" has not been triggered, as New York State has made steady progress in developing its TMDL program over the past two decades. Defendants argue that, under the constructive submission doctrine, EPA's "deeming duty" arises only in the face of complete nonfeasance by the State; *i.e.,* in order to declare a constructive submission of inadequate TMDLs, EPA must conclude that the State is ignoring its TMDL obligation entirely. Defendants claim that the administrative record amply supports their conclusion that New York is making progress in formulating TMDLs, and that an agency intervention that amounts to a vote of no confidence is inappropriate and potentially counterproductive. The Court agrees.

Upon review of the administrative record and joint appendix of documents submitted by the parties, the Court is fully satisfied that EPA's decision *not* to declare a "constructive submission" of no TMDLs by New York State is supported by the record, and is clearly not arbitrary, capricious, or contrary to law.

Although New York did not submit TMDLs to EPA for approval prior to the filing of plaintiffs' suit, it is clear from the

record that New York was actively engaged in the preparation of TMDLs as early as the mid–1980s, and maintained close communication with EPA during that time regarding its progress. The record indicates that, in addition to its substantial efforts to comply with other provisions of the Clean Water Act during the 1970s and 1980s, New York began its TMDL planning as early as 1986. *See* JA at 2045; *see also id.* at 2250, 2930.

EPA Administrator Carol M. Browner, a named defendant in this suit, has frankly acknowledged what some scholarly observers had previously suggested:[4] that the TMDL program was consciously neglected by EPA until recent years, while resources were dedicated to other components of EPA's water quality control efforts under the CWA. *See* "Testimony of Carol Browner," Feb. 23, 2000, 2000 WL 11068367 (before the Senate Committee on Agriculture) [hereinafter, "Browner Testimony"].

> The TMDL program was designed to provide a safety net, catching water bodies that were not protected or restored by the implementation of the range of general, broadly applicable, pollution control programs authorized in the Clean Water Act.
>
> Until the early 1990's, however, EPA and States gave top priority to implementing these general clean water programs and gave lower priority to the more focused restoration authorities of the TMDL program. As a result, relatively few TMDLs were developed and many State lists were limited to a few waters and were not submitted in a timely manner.

*Id.*

Notwithstanding the fact that EPA was not pushing the states to develop TMDLs during the 1980s, New York was beginning to satisfy its obligation under § 303(d), unlike many states that turned a blind eye

to the provision. Nonetheless, it is conceded by defendants that actual efforts to develop, submit, and approve TMDLs that comply with statutory requirements did not begin in earnest until this lawsuit was commenced.

Since that time, the administrative record and joint appendix reflect that New York has been entirely cooperative in satisfying its TMDL obligation, and has at no point suggested to EPA that it would or could not shoulder its burden. Indeed, New York has submitted numerous proposed TMDLs during the pendency of this lawsuit, notwithstanding plaintiffs' contention that these submissions are facially inadequate.

In September 1997, EPA and New York State entered into a Memorandum of Agreement ("MOA"), which established an eight-year schedule for promulgation of TMDLs for all 129 water quality limited segments ("WQLSs") included on the State's 1996 § 303(d) list. *See* Declaration of Kathleen Callahan at 2 & Exh. 1, JA at 6907–10. Under the MOA, the State agreed to establish, with EPA's help, TMDLs for fifty "high priority" WQLSs by December 31, 2001. *See id.* The State agreed to establish the remaining 79 TMDLs over the four years 2002 to 2005, with 25% to be completed in each of these four years. *See id.* at 2–3.

On April 14, 1998, New York State submitted its 1998 § 303(d) list to EPA. *See id.* at 3. The 1998 list identified an additional 400 WQLSs not included in the 1996 list. *See id.* The 1998 list increased the number of "high priority" WQLSs from 50 to 59, and provided that TMDLs for all but one "high priority" segment would be completed on the timetable established by the 1996 MOA. *See id.* at 3–4. New York proposed that the TMDL submission deadline for New York/New Jersey Harbor

---

**4.** *See, e.g.,* Oliver A. Houck, *TMDLs III: A New Framework for the Clean Water Act's Ambient Standards Program,* 28 Envtl.L.Rep. 10415 (1998); Oliver A. Houck, *TMDLs, Are We There Yet?: The Long Road Toward Water Quality–Based Regulation Under the Clean Water Act,* 27 Envtl.L.Rep. 10391 (1997).

waters be extended from December 31, 2001, to December 31, 2005, in light of the fact that the 1998 list included a use impairment of fish consumption resulting from standard exceedances for priority organics and/or pesticides caused by contaminated sediment and/or urban runoff, whereas the original deadline was based solely on use impairments due to standard exceedances for metals or pollutants associated with combined sewer overflow. *See id.* at 4. The State concluded, and EPA agreed, that the expanded range of use impairments and the corresponding need to promulgate additional TMDLs justified such an extension. *See id.* New York retained the December 31, 2005, deadline for all non-high priority WQLSs, with the exception of a number of segments denominated "monitored standard exceedances." *See id.* The State identified those waterbodies where, "because of natural background concentrations of iron, the current standard for [a given] pollutant is exceeded and the scientific basis for the standard is subject to review," and proposed for them a December 2008 deadline, to provide additional time to accommodate this review. *Id.* at 5. On July 2, 1998, EPA approved New York's 1998 § 303(d) list, and on September 30, 1998, EPA accepted the State's proposed deadlines for establishing TMDLs. *See id.*

Thus, to date, while New York has not promulgated TMDLs for every waterbody on its most recent § 303(d) list, it has unquestionably formulated and submitted *some* TMDLs, and has dedicated substantial resources to the problem and amply demonstrated its good-faith interest in collaborating with EPA to bring the State's TMDL program to completion. On this basis alone, the Court can conclude that EPA's decision not to declare a "constructive submission" of "no TMDLs" by New York is well-supported by the record. Still, there is more to the story.

Across the nation, EPA's TMDL program is in a state of flux. In her testimony before the Senate Committee on Agriculture, defendant Browner indicated that in 1996, EPA concluded that "there was a need for a comprehensive evaluation of the TMDL program." Browner Testimony, 2000 WL 11068367. This led to the formation of a TMDL committee under the Federal Advisory Committee Act (FACA), 5 U.S.C. app. §§ 1–14. *Id.* The FACA TMDL committee "was composed of 20 individuals with diverse backgrounds, including agriculture, forestry, environmental advocacy, industry, and State, local, and Tribal governments." *Id.* The advice of the committee, *see* JA at 7138–7266, guided EPA's proposed revisions of the TMDL regulations, published for notice and comment in August 1999, and expected to be made final later this year, following EPA's review of public comments. *See* Proposed Revisions to the Water Quality Planning and Management Regulation, 64 Fed.Reg. 46,012 (1999); *see also* Letter of J. Charles Fox, Assistant Administrator, EPA Office of Water, to Congressman Bud Shuster, Apr. 5, 2000 [hereinafter, "Fox Letter"].

Within the context of these efforts at TMDL reform, and with TMDL litigation pending in numerous courts, EPA still believes that the states reasonably require a total of 8 to 13 years to complete their TMDL development. *See* Browner Testimony, 2000 WL 11068367. In fact, the proposed rule suggests extending this timetable to 15 years. *See* Fox Letter. States have been asked to take a phased approach to the development of TMDLs, by which they first promulgate TMDLs for the most seriously threatened waterbodies, and address the remainder on a rolling basis, with a fixed deadline for full compliance. *See* Browner Testimony. Browner observes that these "are mid-course changes to the existing program based on current data and first-hand, on-the-ground knowledge regarding the status of the Nation's waters." *Id.* The proposal to extend the timetable for TMDL submission to 15 years "recogniz[es] that some States need to develop many TMDLs and that it takes

time to develop a useful and effective TMDL." *Id.*

While EPA's early record on TMDLs is far from admirable, it is clear that EPA is now taking its responsibilities in New York very seriously and taking reasonable strides to bring the TMDL program to fruition. At present, EPA is working closely with New York State to develop TMDLs for each of the State's § 303(d) listed waterbodies, and to honor its obligations under the CWA. Moreover, as noted above, EPA plans to implement extensive changes to the TMDL program later this year.[5]

In addition, EPA and New York State have agreed to negotiate a Performance Partnership Agreement ("PPA") every two years, establishing "the mutual expectations and undertakings of each agency in carrying out the water program in New York State." Callahan Decl. at 6. Each year New York must also submit, and EPA must approve, work plans that "set out the scope of work the State will undertake under various EPA grants of federal assistance to the NYS DEC." *Id.* Furthermore, the PPA and grant work plans "spell out the specific undertakings each agency will commit to each year" and "identify funding each agency will make available to carry out the activities identified and, where appropriate, the technical assistance that may be required of either agency to perform the work." *Id.* at 6–7. EPA has made approximately $8.2 million in federal funds available to assist New York directly in developing TMDLs for its waterbodies. *See id.* at 7 & Table A. The Clinton Administration's Fiscal Year 2001 budget increases TMDL grant funding for the states from $365 million to $410 million. *See* Fox Letter.

Finally, EPA will monitor the State's progress in TMDL development by means of a Grant Review and Oversight Group ("GROG"). *See id.* at 8. EPA and New York have entered a Memorandum of Understanding ("MOU") for the establishment of this group. *See id.*, Exh. 3. Under the MOU, EPA and the State will meet quarterly to discuss the status of each grant awarded by EPA, and New York's commitments thereunder. *See id.* at 8. According to EPA, this process will provide for early identification of the State's inability to honor any such commitment, and an opportunity for EPA to examine the reasons for the inability, explore possible remedial actions with the State, and seek agreement on a new commitment date where necessary. *See id.* at 8–9.

While plaintiffs are correct to point out that New York's promises of *future* action are by themselves insufficient to avoid declaration of a "constructive submission," the Court considers the future plans established by New York and EPA to be an important sign, informed by New York's diligence in the past, that the intrusive injunctive remedies requested by plaintiffs are not warranted here. Not only has New York consistently cooperated in the TMDL effort, but it has pledged itself to a reasonable, even ambitious, timetable for completion of these tasks.

The Court cannot conclude, based on the record before it, that EPA has acted arbitrarily or capriciously, or otherwise contrary to law, in declining to declare a "constructive submission" by New York of no TMDLs. As the Court noted in *NRDC II*, the "constructive submission" doctrine

---

**5.** *Cf. Natural Resources Defense Council, Inc. v. EPA*, 16 F.3d 1395, 1404 (4th Cir.1993) (affirming district court decision granting EPA's motion to dismiss, noting that APA review of EPA's dioxin standard was "premature and would foster unnecessary piecemeal litigation" where EPA regulation was presently under review: "A waste of judicial resources is almost inevitable if we were to allow an exhaustive review of EPA's current water quality criteria, only to have EPA drastically overhaul its existing water criteria with a completely new and different standard.... We will not disturb this highly technical administrative process at this point and instead will allow it an opportunity to run its course.")

and the corollary "deeming duty" exist only by judicial gloss on the Clean Water Act. The rationale behind this judicial law-making, as first articulated by the Seventh Circuit in *Scott*, is that "the CWA should be liberally construed to achieve its objectives—in this case to impose a duty on the EPA to establish TMDL's when the states have defaulted *by refusal to act* over a long period." *Scott*, 741 F.2d at 998 (emphasis added). The *Scott* court found that EPA had a duty to intervene because Congress could not have intended that "an important aspect of a federal scheme of water pollution control could be frustrated by the refusal of states to act." *Id.* at 997. The Seventh Circuit in *Scott* made clear, however, that the duty to declare a "constructive submission" could be avoided if "EPA promptly comes forward with persuasive evidence indicating that the states are or will soon be, in the process of submitting TMDL proposals." *Id.* at n. 11.

The intent of the "constructive submission" doctrine is to ensure that EPA will ultimately bear a mandatory duty to act in furtherance of the goals of the CWA if a state refuses to act. Despite New York's understandably slow pace in the face of EPA's early neglect of the TMDL program, the record amply supports EPA's conclusion that New York has not in the past "refused," and is not presently "refusing," to act in furtherance of the TMDL program mandated by the CWA.[6] In fact, the contrary is true. Accordingly, so long as New York continues to participate ac-

tively and meaningfully in the effort to promulgate TMDLs for the waterbodies on its § 303(d) priority list, the Court is of the view that the State has not "refused" to act, and EPA therefore is under no duty to declare a "constructive submission" of inadequate TMDLs by New York. The determination as to whether the State's participation is active and meaningful is one for EPA to make, based on the record before it. The Court cannot say, however, based on the administrative record, that EPA has acted arbitrarily or capriciously in concluding that New York's participation has been sufficiently active and meaningful to obviate resort to the "constructive submission" approach. Accordingly, plaintiffs are not entitled to relief at this time on their § 706(2)(A) theory under Claim Six.

## B. Agency Action Unlawfully Withheld or Unreasonably Delayed

In *NRDC II*, the Court invited plaintiffs to amend their complaint to add a § 706(1) argument to certain of their APA claims. *See NRDC II*, 30 F.Supp.2d at 384. On December 12, 1998, plaintiffs filed their Fourth Amended Complaint, which added allegations of unreasonable delay and unlawful withholding of agency action to Claims Six, Seven, Eleven and Thirteen.[7] Section 706(1) provides the courts with jurisdiction to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

---

6. Indeed, as defendants argue, *see* Defs.' Br. at 40, it is beyond dispute that New York has submitted—and EPA has approved—some TMDLs, at the very least those that are the subject of plaintiffs' Claim Nine. It is hard to reconcile this fact with plaintiffs' contention that New York has submitted "no TMDLs," or has "refused" to participate in the process, as contemplated by the Seventh Circuit in *Scott*. On a very similar set of facts, one district court wrote, "Minnesota has identified TMDLs that it believes should receive the highest priority, it has initiated work on developing those TMDLs, and has implemented some TMDLs. Although Minnesota and the EPA may not be implementing TMDLs as

quickly as plaintiffs would like, the Act does not set deadlines for the development of a certain number of TMDLs. The act instead requires the development of TMDLs in accordance with the priority ranking of the WQLS list. A finding of a constructive submission of no TMDLs would therefore be inappropriate on this record." *Sierra Club v. Browner*, 843 F.Supp. 1304, 1314 (D.Minn.1993).

7. Although plaintiffs formally added a § 706(1) component to Claim Thirteen, they appear to have abandoned the argument on this claim, as it is not addressed in either of their briefs.

In inviting plaintiffs to amend their complaint in this fashion, the Court in *NRDC II* directed the parties to consider several cases decided by the United States Court of Appeals for the District of Columbia Circuit under § 706(1). Because this subsection of the APA is much less frequently invoked than § 706(2)(A), the courts of the Second Circuit have only briefly considered the applicable legal standard thereunder, and have generally looked to D.C. Circuit precedent for guidance. *See, e.g., Reddy v. Commodity Futures Trading Comm'n,* 191 F.3d 109, 120 (2d Cir.1999) (following *Public Citizen Health Research Group v. Commissioner,* 740 F.2d 21 (D.C.Cir.1984)); *Natural Resources Defense Council, Inc. v. EPA,* 595 F.Supp. 1255, 1269 (S.D.N.Y.1984) (Duffy, J.) (following *Sierra Club v. Gorsuch,* 715 F.2d 653 (D.C.Cir.1983)). Accordingly, the Court looks to the case law of the District of Columbia Circuit, as elaborated below and as followed by several circuits. *See, e.g., Forest Guardians v. Babbitt,* 164 F.3d 1261, 1272–73 (10th Cir.1998); *Oil, Chemical & Atomic Workers Union v. OSHA,* 145 F.3d 120, 123 (3d Cir.1998); *Independence Mining Co. v. Babbitt,* 105 F.3d 502, 507 (9th Cir.1997); *In re City of Virginia Beach,* 42 F.3d 881, 885 (4th Cir.1994); *Towns of Wellesley, Concord, and Norwood, Mass. v. FERC,* 829 F.2d 275, 277–78 (1st Cir.1987).

As the Tenth Circuit thoroughly explored in *Forest Guardians,* the components of § 706(1)—"unreasonably delayed" and "unlawfully withheld"—are mutually exclusive. *See Forest Guardians,* 164 F.3d at 1272; *see also Sierra Club v. Thomas,* 828 F.2d at 794–95 & nn. 77–80. An agency action may be deemed "unreasonably delayed" where the governing statute does not require action by a date certain, whereas an action is "unlawfully withheld" when an agency fails to meet a clear deadline prescribed by Congress. *See Forest Guardians,* 164 F.3d at 1272; *see also Madison–Hughes v. Shalala,* 80 F.3d 1121, 1124–25 (6th Cir.1996).

It is clear that defendants' duty to declare a "constructive submission" has no formal deadline. Not only has the Court held that is unclear *when* such a duty arises, *see NRDC II,* 30 F.Supp.2d at 376–78, but because the CWA does not explicitly impose such a duty, plaintiffs can claim no statutory mandate that EPA declare a "constructive submission" by a date certain. Accordingly, plaintiffs cannot succeed in arguing that EPA "unlawfully withheld" agency action by declining to declare a "constructive submission" by New York State.

Therefore, the Court must treat plaintiffs' § 706(1) argument under Claim Six as an allegation that EPA "unreasonably delayed" agency action. The Court analyzes this claim with reference to the so-called *"TRAC* factors" described by the District of Columbia Circuit in the case of *Telecommunications Research and Action Center v. FCC,* 750 F.2d 70 (D.C.Cir.1984) [hereinafter, *"TRAC"*]; *see also In re United Mine Workers of America Int'l Union,* 190 F.3d 545, 549 (D.C.Cir.1999); *In re Int'l Chem. Workers Union,* 958 F.2d 1144, 1149–50 (D.C.Cir.1992); *In re Monroe Communications Corp.,* 840 F.2d 942, 945–47 (D.C.Cir.1988); *Sierra Club v. Thomas,* 828 F.2d 783, 794–98 (D.C.Cir. 1987); *Cutler v. Hayes,* 818 F.2d 879, 897–98 (D.C.Cir.1987).

In *TRAC,* the D.C. Circuit summarized its earlier decisions as establishing "the hexagonal contours of a standard," which, although "hardly ironclad, ... provides useful guidance in assessing claims of agency delay." *TRAC,* 750 F.2d at 79. The *TRAC* court enumerated the following six factors to be considered by the courts in gauging the reasonableness of administrative delay:

(1) the time agencies take to make decisions must be governed by a 'rule of reason';

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that

statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature and extent of the interests prejudiced by delay;

(6) the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.'

*United Mine Workers,* 190 F.3d at 549 (quoting *TRAC,* 750 F.2d at 80) (internal citations omitted).

Of course, the Court can only compel EPA to take an action that it is under a duty to perform. *See generally* 5 U.S.C. § 706. The Court has held, both on plaintiffs' CWA claim and on their § 706(2) APA theory under Claim Six, *supra,* that EPA was entitled to conclude that its duty to declare a "constructive submission" of no TMDLs had not been triggered. As the Court finds that EPA is not presently under a duty to declare such a "constructive submission," it is illogical, and perhaps therefore unnecessary, to consider whether EPA unreasonably delayed such a declaration.

■ Nonetheless, given the importance and complexity of this action and the relative scarcity of Second Circuit authority in this area, the Court applies the so-called "*TRAC* factors" to plaintiffs' unreasonable

delay claim, assuming *arguendo* that EPA was under a duty to take some action. Even giving plaintiffs the benefit of this assumption, the Court finds that EPA did not unreasonably delay agency action by failing to declare a "constructive submission."

As a preliminary matter, the Court notes that "[a]ny discussion of the standards relevant to the issue of delay must begin with recognition that an administrative agency is entitled to considerable deference in establishing a timetable for completing its proceedings." *Cutler v. Hayes,* 818 F.2d at 896 (citing *Sierra Club v. Gorsuch,* 715 F.2d at 658). With this in mind, the Court proceeds to consider, *seriatim,* the six factors identified by the District of Columbia Circuit for assessing the reasonableness of administrative delay.

The first of six considerations under *TRAC* is that "the time agencies take to make decisions must be governed by a 'rule of reason,'" and agency action should be compelled by the courts only when agency delay is "egregious." *TRAC,* 750 F.2d at 79–80. In applying the "rule of reason" to EPA's alleged delay of agency action, the Court must be mindful that "the question of reasonableness is closely tied to the particular facts of the case," and that "[e]ach case must be analyzed according to its own unique circumstances." *Air Line Pilots Assoc. Int'l v. Civil Aeronautics Bd.,* 750 F.2d 81, 86 (D.C.Cir.1984). The Court must therefore consider whether EPA's delay in declaring a "constructive submission" is reasonable, in light of the particular circumstances of this case.[8]

---

8. Plaintiffs cite three cases in which courts have held administrative delays of various lengths to be unreasonable. *See In re Intern. Chemical Workers Union,* 958 F.2d 1144, 1149–50 (D.C.Cir.1992) (OSHA's six-year delay in promulgating occupational health standards for cadmium was unreasonable); *NRDC v. EPA,* 595 F.Supp. at 1270 (EPA's seven-year delay in establishing final test rules for chemicals regulated under the Toxic Substances Control Act was unreasonable);

*Raymond Proffitt Foundation v. EPA,* 930 F.Supp. 1088, 1103–04 (E.D.Pa.1996) (EPA's 19–month delay in publishing a water quality standard following disapproval of state's submission was unreasonable). Plaintiffs' reference to these cases demonstrates a lack of understanding of the governing law. The "rule of reason" requires the courts to evaluate alleged agency delay in light of the particular facts of a given case; accordingly, there is no hard-and-fast rule as to what amount of

Most persuasive to the Court is the fact that New York State has continuously worked with EPA to establish TMDLs for the State's waterbodies, and has committed to a schedule by which all required TMDLs will be promulgated and submitted. *See* Callahan Decl., Exh. 1, JA at 6907. EPA has likewise pledged funding to the State to support these efforts. Considering the clear intent of Congress to form a partnership of state and federal governments to carry out the goals of the CWA,[9] the Court finds EPA's efforts to maintain this partnership with New York—without supplanting the State by declaring that it has refused to cooperate—to be entirely reasonable and consistent with the administrative record. Absent a statutory directive of Congress as to when (or whether) EPA must declare a "constructive submission," EPA acts reasonably in attempting to accommodate the State rather than pushing it aside and eviscerating the partnership intended by Congress.

The second *TRAC* factor prompts the Court to consider any "timetable or other indication of the speed with which [Congress] expects the agency to proceed in the enabling statute." *TRAC*, 750 F.2d at 80. Plaintiffs urge that the CWA was intended to effect swiftly the conservation of the nation's waterbodies, and the Court has observed in the past that the "enactment by Congress, to the day, of specific deadlines, demonstrates a congressional intent that TMDLs be established promptly." *NRDC*, 909 F.Supp. at 157–58. It does not necessarily follow, however, that this sense of temporal urgency must be extended to the "constructive submission" approach. First, if the development of TMDLs takes more time than Congress originally imagined, it is not unreasonable

for EPA to conclude that getting the job done right is preferable to getting it done quickly. Second, as the Court has observed, the "constructive submission" doctrine is judge-made, and therefore no reference is made to it by Congress. While the Court agrees that Congress intended the provisions of the CWA to be realized as quickly as possible, plaintiffs cannot assume that Congress preferred alacrity to a functioning partnership among EPA and the states. *See supra*, n. 9. In fashioning the "constructive submission" doctrine, the Seventh Circuit never suggested that it be used to remove a state from this partnership for moving too slowly, but rather that EPA be required to act in the face of a state's total intransigence. *See Scott*, 741 F.2d 992. Thus, it is far from certain that Congress would wish EPA to declare a "constructive submission" in order to expedite New York's TMDL development, at the expense of the State's future participation in the program.

The third *TRAC* factor suggests that "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *TRAC*, 750 F.2d at 80. Although plaintiffs argue that EPA's alleged delay in declaring a "constructive submission" will have a serious impact on the public health, they fail to substantiate this claim. Plaintiffs suggest that "among other things, elevated phosphorus levels can lead to an increased production of suspected carcinogenic by-products in New York City tap water." Pls.' Br. at 9, 35. In support of this contention, plaintiffs cite to three pieces of evidence in the administrative record and joint appendix. The first is a conclusory statement in a New York City report, to the effect that

time constitutes an unreasonable delay. Two of the cases cited by plaintiffs involve entirely different statutes, while the third involves a separate provision of the Clean Water Act. None of these cases is helpful to the Court in resolving this claim.

9. "The Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical and biological integrity of the Nation's waters.'" *Arkansas v. Oklahoma*, 503 U.S. 91, 101, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992) (quoting 33 U.S.C. § 1251(a)).

eutrophication "affects several water quality parameters that are important with respect to public health." AR at 1044. The second is plaintiff NRDC's own comment in opposition to the proposed TMDLs for the Croton System, in which it alleges that algal blooms "cause gastrointestinal problems" and toxins released by algae "are harmful to swimmers and prevent contact recreation." AR at 2223. Finally, plaintiffs refer to an EPA document discussing the need for water filtration in the Croton System, which makes only tangential reference to public health concerns. Plaintiffs cannot establish through allegations alone a relationship between the delay in developing TMDLs and some detriment to the public health. *See, e.g., Oil, Chemical & Atomic Workers Union,* 145 F.3d at 123 ("This presupposes ... that the evidence before the agency sufficiently demonstrates that delay will in fact adversely affect human health to a degree which necessitates a priority response"); *Independence Mining,* 105 F.3d at 509–10 (affirming district court holding that "potential impact ... on public health and welfare was no more than speculative.")

Moreover, plaintiffs fail to acknowledge that other water quality control measures presently in place may adequately protect the public from the adverse health effects they allege. *Cf. Cutler,* 818 F.2d at 898 ("Lack of alternative means of eliminating or reducing the hazard necessarily adds to unreasonableness of a delay.") In reference to the CWA, the Supreme Court observed in *Arkansas v. Oklahoma,* 503 U.S. at 101, 112 S.Ct. 1046, that "[t]he primary means for enforcing [water quality] limitations and standards is the NPDES [program]," rather than the TMDL program. *See also Costle,* 657 F.2d at 279 (holding that CWA "assigned secondary priority to the standards and placed primary emphasis upon both a point source discharge permit program and federal technology-based effluent limitations.") Even plaintiffs themselves observe, in another context, that the waters can be protected through "other legal handles such as [the]

anti-degradation program (adopted pursuant to another provision of the Clean Water Act) to prevent dischargers from increasing pollution loadings to unacceptable levels." Pls.' Repl.Br. at 29. Moreover, the Court finds that the legally binding 1997 Memorandum of Agreement among the State, the City, and EPA governing the New York City Watershed serves to ensure the safety of drinking water from these reservoirs, as does the New York Sanitary Code, *see* N.Y.Pub. Health Law § 225, which may specify the criteria to be met by public 'water supplies. Finally, plaintiffs may bring a citizen suit under the federal Safe Drinking Water Act, 42 U.S.C. §§ 300f–300j, if their primary concern is with the relationship between drinking water quality and the public health. *See* 42 U.S.C. § 300j–8.

Even assuming, *arguendo,* that these measures are inadequate to protect the public health in the absence of TMDLs, plaintiffs fail to demonstrate that the incremental water pollution that might result from promulgating TMDLs on the present schedule, rather than on a faster track, would significantly diminish the public health. Plaintiffs fail to establish that any increment in the time EPA and New York take to establish TMDLs will have anything more than a *de minimus* effect on the condition of New York's waterbodies, let alone on the public health. It may even be the case that preserving the partnership between EPA and New York will, by sustaining New York's contribution of monetary and human resources, as well as by harnessing the State's institutional knowledge of local and regional water quality concerns, lead to a more robust TMDL program, which may. have even greater benefits for both water quality and public health in the long term.

The fourth *TRAC* factor prompts the Court to "consider the effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC,* 750 F.2d at 80. Because plaintiffs seek only to

compel EPA to declare that New York State's failure to submit TMDLs for EPA's approval constitutes a "constructive submission" of inadequate TMDLs, the desired agency action would not tax EPA's resources. However, this declaration would trigger EPA's mandatory duty, within 30 days, to approve or disapprove the "constructive submission." *See* 33 U.S.C. § 303(d)(2). Assuming that EPA's only choice would be to disapprove the "constructive submission," EPA would then be under a further duty to promulgate TMDLs for each waterbody on the State's priority list. *See id.* Thus, were the Court to compel EPA to declare a "constructive submission," it would effectively require EPA to promulgate TMDLs for these waterbodies, commencing within 30 days of the entry of judgment. Imposing such a burden on EPA would naturally require the agency to dedicate substantial resources to this task, and would interfere with EPA's ability to order its own priorities and allocate its resources. Such a course might have even harsher results, as New York would no longer apply its own resources to the problem, and EPA would be forced to redirect resources from other programs to satisfy the proposed court order. "Because 'a court is in general ill-suited to review the order in which an agency conducts its business,' [the courts] are properly hesitant to upset an agency's priorities by ordering it to expedite one specific action, and thus to give it precedence over others." *Sierra Club v. Thomas,* 828 F.2d at 797 (quoting *Environmental Defense Fund, Inc. v. Hardin,* 428 F.2d 1093, 1099 (D.C.Cir.1970)). "Given that Congress provides EPA with finite resources to satisfy [its] responsibilities" under "a handful of . . . complex environmental statutes," EPA "cannot avoid setting priorities among them." *Id.* at 798. Accordingly, granting plaintiffs their requested relief on this claim would likely interfere with EPA's prioritization of its many statutorily required activities.

The fifth *TRAC* factor directs the Court to "take into account the nature and extent of the interests prejudiced by delay." *TRAC,* 750 F.2d at 80. The Court measures prejudice to plaintiffs by comparison of two alternate scenarios. In the first scenario, the Court compels the declaration of a "constructive submission" and EPA promulgates TMDLs for New York, in accordance with a schedule yet unknown. In the second scenario, the Court declines to compel agency action, and EPA continues its collaborative efforts with New York under the timetable contained in the MOA. Assuming that plaintiffs have an interest in seeing TMDLs promptly established for the State's waterbodies, it is unclear that the first scenario would advance this interest more swiftly than the second. EPA represents that the schedule it established with the State is a reasonable, even ambitious, one. Absent New York's assistance, EPA might require even more time to develop TMDLs. The Court must also consider the interests that might be prejudiced by granting the relief sought by plaintiffs. In light of the state-federal partnership contemplated by the CWA, any outcome that removes the State from the process of developing TMDLs for its waterbodies deprives the State of its interest in participating, and contravenes Congress's clear intent for collaboration between states and EPA. Thus, it is unclear that any party's interest would truly be advanced by compelling EPA to declare a "constructive submission" without delay.

The sixth and final *TRAC* factor reminds the Court that it "need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *TRAC,* 750 F.2d at 80. In this action, there is no allegation that EPA acted in bad faith by failing to declare a constructive submission. While this alone is inadequate to prevent the Court from compelling agency action, the good faith manifested by both EPA and the State militates against intrusive equitable relief. *See, e.g., Sierra Club v. Gorsuch,* 715 F.2d at 659 n. 35 (citing *National Congress of Hispanic American*

*Citizens v. Usery,* 554 F.2d 1196 (D.C.Cir. 1977) ("Even where a statutory timetable exists, noncompliance with it has sometimes been excused as long as the agency has acted rationally and in good faith.")

Thus, even assuming, *arguendo,* that EPA's duty to declare a "constructive submission" has been triggered, the Court finds that EPA did not unreasonably delay such a declaration, following the detailed standard described by the D.C. Circuit in *TRAC.* Accordingly, plaintiffs are not entitled to relief on their § 706(1) theory under Claim Six. Because plaintiffs are not entitled to relief at this time on either theory under Claim Six, the claim is hereby dismissed.

## C. Plaintiffs' Claim Seven

In Claim Seven, plaintiffs contend that, by failing to promulgate its own TMDLs for the waterbodies on New York's § 303(d) list, EPA acted arbitrarily or capriciously or otherwise not in accordance with law, and unreasonably delayed or unlawfully withheld agency action. As a matter of law, however, the success of Claim Seven is contingent on the success of Claim Six. Because the Court has held, *supra,* that defendants are entitled to judgment on Claim Six, plaintiffs' Claim Seven cannot survive.

It is clear under the Clean Water Act that EPA's duty to formulate TMDLs arises only upon the expiration of 30 days after EPA disapproves a state's submission—or, as has been argued here, "constructive submission"—of TMDLs. *See* 33 U.S.C. § 1313(d)(2).

Under the Clean Water Act, EPA's duty to promulgate TMDLs on the State's behalf arises *only* after the State's proposed TMDLs have been disapproved by EPA. Because the Court has found that EPA acted consistently with the Clean Water Act, *see NRDC II,* 30 F.Supp.2d at 377, and the APA, *see supra,* in not declaring a "constructive submission" of inadequate TMDLs by New York State, EPA is presently under no duty to approve or disap-

prove the yet nonexistent "constructive submission." Even if plaintiffs were successful on their claim that EPA was under a present duty to declare a "constructive submission" and, within 30 days, to approve or disapprove the State's "constructive submission," EPA would still be a step removed from any duty under the CWA to promulgate TMDLs for the State. Because the Court has found EPA's conduct in deciding not to declare a "constructive submission" to be consistent with both the CWA and APA, defendants are under no present duty to promulgate TMDLs for the State, and plaintiffs' Claim Seven must fail. This claim is hereby dismissed.

## D. Plaintiffs' Requested Relief on Claims Six and Seven

Although the Court finds that it is without authority under the Administrative Procedure Act to set aside EPA's decision not to declare a "constructive submission" or to compel such a declaration, the Court remains concerned by plaintiffs' grave allegations that—absent judicial intervention—the TMDL program prescribed by the Clean Water Act will never materialize.

Although the slow pace set by New York State Department of Environmental Control (DEC) and EPA in the first two decades of TMDL development may be an unfortunate legacy for New York's waterbodies, plaintiffs are wrong to suggest that the Court may punish defendants for any past inadequacies by interfering with EPA's presently acceptable oversight of the TMDL program. *See, e.g., United Steelworkers of America, AFL—CIO—CLC v. Rubber Mfrs. Ass'n,* 783 F.2d 1117, 1120 (D.C.Cir.1986) (per curiam) ("[W]e decline the invitation to 'punish' OSHA for its past delay by imposing a mandatory, accelerated timetable.") As discussed, *supra,* the APA does not provide plaintiffs with any substantive rights vis-à-vis past agency action (or inaction); it merely gives them a cause of action to seek judicial

enforcement of the agency's present duties. Thus, the remedies provided by the APA are the same whether an agency's period of inactivity spans 30 years or 30 months.

Plaintiffs express concern that this period of inactivity will continue, as the Memorandum of Agreement signed by the State and EPA lacks a means of enforcement. *See, e.g.,* Pls.' Repl.Br. at 33 ("[S]uch 'commitments' amount to little more than unenforceable promises of future action by a non-party to this litigation.") While the Court noted in *NRDC I* that the Memorandum of Agreement entered into by the State and EPA, and the rolling schedule for TMDL development, "are apparently merely aspirational," the Court finds that the signs of progress contained in the MOA, the Callahan Declaration, and elsewhere in the administrative record, are sufficient to justify EPA's decision to continue working with New York rather than pushing the State aside.[10] The Clean Water Act contemplates a partnership of state and federal governments, working together to assure that adequate water pollution controls are established nationwide, but with due regard for local and regional concerns. *See Arkansas v. Oklahoma,* 503 U.S. at 101, 112 S.Ct. 1046. By declining to oust New York State from this partnership and impose its own standards and priorities on New York's waterbodies,

EPA pays due deference to the intent of the statute.

Nonetheless, plaintiffs raise the legitimate concern that the "merely aspirational" timetable agreed upon by New York State and EPA may be disregarded at will. Plaintiffs point to EPA's willingness to extend one of the many deadlines in the MOA as a sign that the progress being made on New York's TMDL program is illusory. *See* Letter of Mark A. Izeman, Sept. 13, 1999. Plaintiffs further argue that federal defendants "have demonstrated by their conduct that their own self-imposed, voluntary deadlines are not sufficient to ensure prompt effectuation of the § 303(d) scheme," and that "the failure to issue injunctive relief would send a signal to government agencies that there are few consequences to sidestepping their statutory duties." Pls.' Br. at 66.[11]

While the Court declines to interfere with EPA's technical judgment as to how much time is appropriate for the formulation of complex pollution standards,[12] defendants should not read this Opinion as inviting endless delay of the New York TMDL program. The Court reminds both sides that the courthouse doors remain open, should defendants fail to require the State's substantial compliance with the timetable set forth in the MOA. *See, e.g., United Steelworkers,* 783 F.2d at 1120. The Court will defer to EPA's judgment

---

**10.** Significantly, the 1997 Memorandum of Agreement regarding the New York City Watershed brings the State, the City, and EPA into a legally binding agreement governing the protection of the City's reservoirs and the assurance of drinking water quality and safety. *See* AR at 2672.

**11.** Plaintiffs rely on *Friends of the Earth v. Carey,* 535 F.2d 165, 173 (2d Cir.1976) to suggest that EPA cannot avoid judicial intervention by pointing to "ongoing discussions and activities between New York State and EPA." Pls.' Repl.Br. at 33 n. 47. Plaintiffs' reliance on *Carey* is misplaced. *Carey* involved review of EPA's statutory duties under the Clean Air Act (analogous to the Clean Water Act claims dismissed in *NRDC II*), rather than the sort of APA claims that re-

main before Court. While the consensual activities of the State and EPA may not have been sufficient to cure EPA's failure to heed the requirements of the Clean Air Act in *Carey,* it is clear that, in the instant case, the cooperative efforts of the State and EPA are relevant to, if not dispositive of, the question of whether EPA acted arbitrarily or capriciously in deciding not to declare a "constructive submission."

**12.** In *NRDC II,* the Court observed that EPA was in a good position "to decide when a particular state is sufficiently delinquent so as to justify intervention, applying the agency's expertise as to the subjects addressed by the Act and more extensive knowledge of state compliance with the Act's TMDL program." *NRDC II,* 30 F.Supp.2d at 375.

as to how much latitude New York deserves in abiding by the terms of the MOA, as EPA is better-suited to determine which proposed extensions and variances are reasonable in light of technical issues and competing demands on agency resources. Should the State depart from the MOA so substantially as to frustrate the progress of the TMDL program, the Court will review a revised administrative record for the narrow purpose of determining whether New York's continued intransigence requires EPA to declare a "constructive submission" and proceed down the path toward promulgating TMDLs for the State. The Court is confident that the present administrative record does not require such a drastic course of action, but plaintiffs may renew these claims in the future if new developments warrant it.[13] Accordingly, the Court's dismissal of plaintiffs' Claims Six and Seven is without prejudice, and plaintiffs may pursue these claims anew if defendants'

conduct does not rise to the standard discussed in this Opinion.[14]

## IV. EPA Approval of Eight New York City Reservoir TMDLs

Claim Nine involves the eight TMDLs submitted to EPA by the State of New York on January 31, 1997, *see* AR at 2833, and approved by EPA on April 2, 1997. *See* AR at 3081. Plaintiffs contend that these proposed TMDLs, formulated for eight New York City reservoirs,[15] fail to meet the substantive requirements of the Clean Water Act.[16]

In *NRDC II*, the Court held that EPA's decision to approve these eight TMDLs constituted the performance of a discretionary duty, and therefore was not subject to judicial review under the Clean Water Act. However, the Court denied defendants' motion for summary judgment as to most elements of the parallel APA claim. *See NRDC II*, 30 F.Supp.2d at

---

13. Pursuant to a final EPA rule published in the Federal Register on March 31, 2000, New York and its sister states were not required to submit new § 303(d) lists on April 1, 2000, as had previously been required under EPA regulations. *See* Revision to the Water Quality Planning and Management Regulation Listing Requirements, 65 Fed.Reg. 17,166 (2000) (to be codified at 40 C.F.R. pt. 130). The new rule suspends the submission requirement for 2000, but continues to require submissions on April 1 of even-numbered years, resuming in 2002. *See id.* Although New York's next § 303(d) listing deadline is two years away, the Court fully expects EPA and the State to address any additions or changes made to New York's § 303(d) list in April 2002, or subsequently, in a manner consonant with the existing MOA and this Opinion. Failure to do so will support a finding in any future litigation that EPA's duty to declare a "constructive submission" has been triggered.

14. The Ninth Circuit supported a contrary result in a TMDL case, affirming the district court's enforcement of the terms of the Memorandum of Understanding entered by EPA and the State of Alaska, noting that "standing alone[,] the MOU will not secure faithful compliance with the CWA." *Alaska Center for the Environment v. Browner*, 20 F.3d 981, 987 (9th Cir.1994). The Court prefers the approach of the D.C. Circuit, as described in

*United Steelworkers*, 783 F.2d at 1120 ("We likewise fail to perceive any useful purpose in retaining jurisdiction or requiring periodic progress reports, as requested by petitioners.... [H]owever, we leave the courthouse door open to petitioners to renew their petition for mandamus if OSHA should fail to act with appropriate diligence in following the estimates it has tendered to this court.") *See also Grand Canyon Air Tour Coalition v. FAA*, 154 F.3d 455, 476 (D.C.Cir.1998) ("Although the APA gives courts the authority to 'compel agency action unlawfully withheld or unreasonably delayed,' we are acutely aware of the limits of our institutional competence in the highly technical area at issue in this case.") Given the clear signs of progress and the good faith demonstrated by New York and EPA in the instant suit, the Court believes that intrusive injunctive relief is unjustified on the present record.

15. The eight reservoirs are: Bog Brook, Middle Branch, Croton Falls, East Branch, Diverting, Muscoot, New Croton (in the Croton System), and Cannonsville (in the Catskill/Delaware System). *See* AR at 2851, 2858.

16. Plaintiffs concede that "[t]he eight EPA-approved 'TMDLs' for the New York City reservoirs generally satisfy § 303(d)'s procedural mandates." Pls.' Br. at 42.

380–83. The Court found that there existed genuine issues of material fact as to whether EPA had acted "in accordance with law" in approving these TMDLs, a basis for review under § 706(2). *Id.* Specifically, the Court found issues of fact as to whether the TMDLs: 1) implemented applicable water quality standards; 2) contained a margin of safety; 3) comprised wasteload allocation and load allocation components; 4) established daily pollution limits; and 5) accounted for seasonal variations.

Having undertaken a careful review of the administrative record and joint appendix of documents submitted by the parties, the Court finds as follows.

### 1. Water Quality Standards

Under § 303(d)(1)(C) of the Clean Water Act, TMDLs must be "established at a level necessary to implement the applicable water quality standards." 33 U.S.C. § 1313(d)(1)(C). As the Court has previously noted, the applicable water quality standard in New York State for phosphorus is a narrative one providing that phosphorus shall be limited to "[n]one in amounts that will result in algae, weeds and slimes that will impair the waters for their best usages." N.Y.Comp.Codes R. & Regs. tit. 6, § 703.2. It is uncontested that the best usage for the reservoirs at issue is as a source of drinking water.

The proposed TMDLs submitted by the State to EPA for its approval stated the applicable phosphorus guidance value as 20 micrograms per liter (μg/L). Plaintiffs argue that the 20 μg/L guidance value is inadequate to implement New York's water quality standards, as required by § 303(d)(1)(C), and that EPA's decision to approve such a value is unsupported by law and thus contrary to the APA.

Plaintiffs first argue that this guidance value was inappropriate because it was calculated on the basis of aesthetic considerations, rather than considerations of potability. *See* Pls Br. at 45. Defendants do not dispute that the guidance value was formulated for aesthetic purposes, but maintain that a 20 μg/L is likewise an appropriate phosphorus standard for drinking water, as demonstrated by the administrative record. *See* Defs.' Br. at 56–59. Defendants also note that the "aesthetic considerations" included "taste, odor, and discoloration," which are highly relevant to questions of potability. *See id.* at 57 (citing AR at 982).[17]

As a preliminary matter, the Court agrees with defendants that it is inappropriate to raise form above substance in this context. If 20 μg/L is an appropriate phosphorus guidance value for drinking water as well as for recreational use, then EPA acted reasonably in approving TMDLs that incorporated the 20 μg/L value.

Plaintiffs respond that 20 μg/L is *not* the appropriate value for drinking water and that EPA defied its statutory mandate in approving this figure. In support of this contention, plaintiffs cite to documents in the record that indicate that eutrophication[18] may occur at even lower concentrations of phosphorus, and therefore 20 μg/L is unacceptable. Taken as a whole, however, the record suggests that there is some debate as to the phosphorus level at which eutrophication will occur.[19] Plaintiffs refer

---

17. The State acknowledged that it had applied the 20 (micro)g/L aesthetic standard because it was then the only State standard, and that, while it believed the standard was adequate to ensure potability, it was engaged in research on a purpose-specific standard for use in Phase II TMDLs. *See* AR at 2867.

18. Eutrophication is the "normally slow aging process by which a lake evolves into a bog or marsh.... During eutrophication the lake becomes so rich in nutritive compounds (especially nitrogen and phosphorus) that algae and other microscopic plant life become superabundant, thereby 'choking' the lake." *Arkansas v. Oklahoma,* 503 U.S. at 112 n. 15, 112 S.Ct. 1046.

19. Indeed, the record suggests that the relationship between nutrient loading and eutrophication is dependent on a tremendous number of variables specific to a particular

to a New York City study that classified some reservoirs with less than 20 µg/L phosphorus as eutrophic. *See* Pls.' Repl. Br. at 17–18 (citing AR at 1040). Plaintiffs further refer to the expert report of Dr. Vladimir Novotny, a scientist hired by plaintiffs to submit comments on the proposed TMDLs, suggesting that using the 20 µg/L figure "means that the reservoirs will remain eutrophic." *See id.* at 18 (quoting AR at 2225, 2236). Finally, plaintiffs quote from the deposition testimony of EPA's Rule 30(b)(6) witness, Rosella O'Connor, indicating that under certain circumstances it was possible that a 20 Sg/L standard would not prevent eutrophication. *See id.* (citing JA at 6379).

In response, defendants argue that "the record amply supports the EPA's expert, scientific determination that 20 µg/L is within a range that will not result in eutrophication." Defs.' Br. at 57. In support, defendants cite to the EPA "Gold Book," the agency's manual for water quality criteria, which suggests that "[t]o prevent the development of biological nuisances and to control accelerated or cultural eutrophication, total phosphates as phosphorus (P) should not exceed … 25 µg/L within the lake or reservoir…. Most relatively uncontaminated lake districts are known to have surface waters that contain from 10 Sg/L to 30 µg/L phosphorus." *Id.* at 58 (quoting AR at 244); *see also* AR at 1059 ("NYSDEC's guidance value is well below EPA's recommended level of 25 µg/L [ ] and should therefore be sufficiently protective to control nuisance aquatic growth.")

■ Given the range of opinion on the proper guidance figure for phosphorus, EPA was within its discretion to choose among these values. The Court will not pass on whether the guidance value *plaintiffs* might have chosen would have been better, or whether defendants could have

drawn another conclusion from the record. They clearly could have. But, as the Second Circuit has noted in this context, "that is hardly the point." *Henley v. FDA*, 77 F.3d 616, 621 (2d Cir.1996). The *Henley* Court held that, although plaintiff's arguments were "sound and cogent," and the Court itself "might not have chosen the FDA's course has it been [theirs] to chart," the APA precludes courts for substituting their judgment for that of an agency. *Id.*

"In the face of conflicting evidence at the frontiers of science, courts' deference to expert determinations should be at its greatest." *Cellular Phone Taskforce*, 205 F.3d at 90 (citing *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). "The reviewing court must take into account contradictory evidence in the record, but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. When an agency makes a decision in the face of disputed technical facts, a court must be reluctant to reverse results supported by … a weight of considered and carefully articulated expert opinion." *Id.* at 89, 103 S.Ct. 2246 (citing *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981)); *Federal Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972) (internal quotes and citations omitted); *see also NRDC v. EPA*, 16 F.3d at 1404 (where record supported both water quality standard urged by plaintiffs and one chosen by EPA, "the best course of action is to leave this debate to the world of science to ultimately be resolved by those with specialized training in this field.") "The Court should not supplant the agency's findings merely by

waterbody, and that the scientific community has difficulty establishing precise a quantitative relationship between phosphorus loading and eutrophication. *See, e.g.,* AR at 11–177, 243–247, 329–344, 991–994. This helps to

explain the difference of opinion among the parties to this action, and also explains why formulation of TMDLs for each individual waterbody may be particularly time- and labor-intensive.

identifying alternative findings that could be supported by substantial evidence." *Arkansas v. Oklahoma*, 503 U.S. 91, 113, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992) (declaring ruling by Tenth Circuit an unauthorized "policy choice.")

Furthermore, as in *Cellular Phone Taskforce*, it is clear from the record that, during the notice and comment phase, EPA and the State "did not ignore any of [plaintiffs'] substantial comments, but instead provided a reasoned response to each." 205 F.3d at 92. This evidences EPA's serious contemplation of the available alternatives, and its reasoned choice of the course it followed. The record suggests the same. *See generally*, AR at 3087, 3092.

### 2. Margin of Safety

Under § 303(d)(1)(C) of the Clean Water Act, TMDLs must contain a "margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). Although the Phase I reservoir TMDLs do contain a 10% margin of safety, plaintiffs maintain that such a margin is inadequate, and that these TMDLs should therefore have been disapproved by EPA.[20]

Plaintiffs cite to a methodology document that suggests a 20% margin of safety for phosphorus TMDLs, *see* Pls.' Br. at 48 (citing AR at 1448, 3089), and to suggestions in plaintiffs' expert Dr. Novotny's report that 30% is the proper margin of safety. *See id.* (citing AR at 3040). Plaintiffs quote a 1991 EPA technical support document for the proposition that "under the Clean Water Act, the margin of safety for the reservoir 'TMDLs' must 'take[ ] into account any lack of knowledge' between predicted phosphorus loadings and expected attainment of applicable water quality standards.'" *See* Pls.' Repl.Br. at 21 (quoting JA at 3449).

Defendants contend that the 10% margin of safety is itself sufficient to satisfy the mandate of Congress, but operates in conjunction with a set of conservative assumptions built into each reservoir TMDL that provides an additional measure of safety. *See* Defs.' Br. at 59–63. In granting EPA's motion for summary judgment in a TMDL case, the Western District of Washington found that "the considerable number of conservative assumptions incorporated into EPA's calculations, and the EPA's recognition of and adjustments for some scientific uncertainty, ensures the margin of safety required by the Clean Water Act." *Dioxin/Organochlorine Center v. Rasmussen*, 1993 WL 484888 at *8 (W.D.Wash. Aug.10, 1993), *aff'd*, 57 F.3d 1517 (9th Cir.1995). Plaintiffs contend that these assumptions are not truly conservative, a position they base on their own scientific analysis of the assumptions. *See* Pls.' Repl.Br. at 22–23 (arguing, *inter alia*, that the Reckhow Land Use Model chosen by EPA as "conservative" is actually "simplistic and contains many uncertainties.")

■ Defendants maintain, and the Court agrees, that—absent more specific guidance from Congress—EPA is in the best position to determine, in its professional judgment, whether a proposed TMDL contains an adequate margin of safety. The question is whether EPA "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the products of expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103

---

**20.** Again, plaintiffs are unsatisfied with the State's suggestion that the standard employed, while believed to be lawful and appropriate, would be reviewed prior to the development of Phase II TMDLs. *See, supra,* n. 13;

AR at 2868. Indeed, the proposed margin of safety for Phase II TMDLs was modified along the lines urged by plaintiffs. *See* AR at 3075–76.

S.Ct. 2856. The record makes clear that EPA gave due consideration to the margin of safety, and exercised its professional judgment with respect thereto.

As the D.C. Circuit has held consistently in the parallel context of the Clean Air Act, an appropriate margin of safety on a pollution control standard need not "spring from a bounty of definitive research as the clear and sole appropriate standard." *Natural Resources Defense Council, Inc. v. EPA,* 902 F.2d 962, 972 (D.C.Cir.1990). Where the administrative record is inconclusive as to the ideal level at which to establish a standard, and suggests a range of values, EPA acts within its discretion to select the appropriate record. *See Public Citizen Health Research Group v. Tyson,* 796 F.2d 1479, 1505 (D.C.Cir.1986) ("as long as Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence"); *Lead Indus. Ass'n, Inc. v. EPA,* 647 F.2d 1130, 1160 (D.C.Cir.1980) ("That the evidence in the record may also support other conclusions, even those that are inconsistent with the Administrator's, does not prevent us from concluding that his decisions were rational and supported by the record.") For these reasons, and on the authority cited by the Court in its discussion of water quality standards, *supra,* the Court finds that EPA's approval of the 10% margin of safety was not arbitrary or capricious, or otherwise not in accordance with law.

### 3. Wasteload Allocation and Load Allocation

EPA regulations require TMDLs to comprise "[t]he sum of the individual [wasteload allocations] for point sources and [load allocations] for nonpoint sources and natural background." 40 C.F.R. § 130.2(i). Plaintiffs originally argued that there was insufficient evidence in the administrative record that the approved TMDLs contain these elements. Defendants direct plaintiffs'—and the Court's—attention to supplemental documentation in the administrative record that satisfies these concerns, and confirms that these TMDLs contained both wasteload allocations and load allocations. *See* Defs.' Br. at 63–64 (citing AR at 3051). In light of defendants' response, plaintiffs appear to have abandoned this component of Claim Nine. For this reason, and because the record provides a rational basis for EPA's approval of these proposed TMDLs with respect to this attribute, the Court will not consider it further.

### 4. Daily Pollution Limits

The Clean Water Act requires states to establish a "total maximum *daily* load" for each relevant waterbody. 33 U.S.C. § 1313(d)(1)(C) (emphasis added). Plaintiffs maintain that EPA acted "contrary to law" in approving TMDLs expressed as annual loads rather than daily loads.

Defendants contend that plaintiffs elevate form above substance in suggesting that a TMDL may only be expressed as a daily limit. Defendants further point to EPA regulations that provide that a TMDL may be "expressed in terms of either mass per time, toxicity, or other appropriate measure." 40 C.F.R. § 130.2(i). Defendants maintain that this regulation is consistent with the CWA, and that EPA's interpretation of the regulation is a reasonable one. EPA's interpretation of its own regulations is entitled to "controlling weight" unless "plainly erroneous or inconsistent with the regulation." *New York Currency Research Corp. v. CFTC,* 180 F.3d 83, 88 (2d Cir.1999) (citing *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)) (internal citations and quotes omitted). As defendants note, and the record indicates, the mass-per-year limit can easily be converted to a mass-per-day limit by multiplying by an appropriate coefficient. *See* Defs.' Br. at 53–54; AR at 3090.

■■ Where an agency's interpretation contradicts the plain language of the statute or regulation in question, the " 'plain language of course controls.' " *Id.* at 89

(quoting *United States v. Lewis*, 93 F.3d 1075). Plaintiffs reason that Congress *meant* "daily" when it wrote "daily," and that the "plain meaning of that language ordinarily informs our understanding of a statutory or regulatory term." *Id.* Although plaintiffs' semantic argument carries some weight under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) [hereinafter, "*Chevron*"], and its progeny, the Court agrees with defendants that EPA's interpretation of the statute and regulation is not plainly erroneous.

As the Supreme Court has noted, an agency's construction of its governing statute is given "controlling weight" not only where the agency attempts to "fill[ ] a gap" in the statute, but also where the agency " 'defines a term in a way that is reasonable in light of the legislature's revealed design.' " *United States v. Haggar Apparel Co.*, 526 U.S. 380, 392, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999) (quoting *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995)). The *Haggar* Court observed that a statute may still "be ambiguous, for purposes of *Chevron* analysis, without being inartful or deficient," noting that "Congress need not, and likely cannot, anticipate all circumstances in which a general policy must be given specific effect." *Id.* Moreover, the Supreme Court has specifically held that the complexity of the Clean Water Act militates in favor of judicial deference to EPA's statutory construction. *See Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 75, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

Plaintiffs suggest that the word "daily" requires no interpretation by EPA, rejecting defendants' argument that EPA's approval of annual phosphorus standards for these reservoirs was actually intended to give effect to the purpose of § 303(d). Nonetheless, the administrative record adequately supports EPA's conclusion that, for some combinations of pollutants and waterbodies, different expressions of the total maximum load of a pollutant are optimal. *See* Defs.' Br. at 65 (citing AR at 28–29, 603). Congress, in one sentence, directs EPA to approve TMDLs for hundreds of different pollutants in thousands of different waterbodies, and it is excessively formalistic to suggest that EPA may not express these standards in different ways, as appropriate to each unique circumstance. Here, EPA reasonably concluded that the best expression of the phosphorus TMDL for these reservoirs was in terms of mass per time (*i.e.*, kilograms per year). *See id.* (citing AR at 28, 31–32, 59, 334). Defendants point to the analysis of the New York City Department of Environmental Protection, suggesting why, scientifically, " 'an annual cycle or growing season cycle is appropriate' " for establishing standards for nutrients like phosphorus. *Id.* at 66 (quoting AR at 2877c). Defendants further cite to the conclusions of the Federal Advisory Committee on the TMDL program and other evidence in the record that daily temporal units are not appropriate for all TMDLs. *See id.* at 66–67 (citing JA at 7185; AR at 3090, 59).

EPA has promulgated rules to assist in the administration of the § 303(d) program, and its application of these rules is accorded substantial deference. The Court defers to EPA's reasonable interpretation of 40 C.F.R. § 130.2(i), and further finds that EPA's approval of TMDLs that expressed maximum phosphorus loads in annual terms is rational and supported by the administrative record, and not arbitrary, capricious, or otherwise contrary to law.

### 5. Seasonal Variations

The Clean Water Act requires that TMDLs account for "seasonal variations." 33 U.S.C. § 1313(d)(1)(C). Plaintiffs contend that the eight approved reservoir TMDLs fail to take seasonal variations into consideration. The parties disagree on three points.

### a. Use of Annual Loads

As the Court concluded, *supra*, EPA acted properly in approving the State's decision to express its phosphorus TMDLs in terms of annual loads rather than daily loads. Plaintiffs argue that phosphorus limits expressed as annual loads cannot satisfy the seasonal variation requirement imposed by the Act. Defendants demonstrate by reference to the administrative record, however, that the proposed annual loads were calculated to incorporate seasonal variations. *See* AR at 1450 ("The current load will be calculated each year by taking the median value of all limnological concentration data for the growing season."); *id.* at 3090 ("The Vollenweider equation is a steady-state equation which is used to derive annual nutrient loadings on a seasonal (growing season) basis. In this analysis, phosphorus loads were evaluated during a growing season (May–Oct.) when conditions are optimal for the available phosphorus to produce algal growth.") *See also* AR at 1373 ("Nutrient budgets and eutrophication models routinely use an annual timestep specifically to average out seasonal fluctuations.") Plaintiffs and their scientific experts may differ with this approach, but the Court must accord deference to EPA's expert judgment as to whether these annual loads satisfactorily incorporated seasonal variations, and the record shows that EPA gave deliberate consideration to the question.

### b. Bromberg Testimony

Plaintiffs contend that the testimony of Albert W. Bromberg, P.E., of the New York State Department of Environmental Conservation, makes clear that the State did not consider seasonal variations when formulating the reservoir TMDLs, and

that EPA could not, in this knowledge, properly approve them.

Defendants correctly observe that the Court's task in adjudicating this APA claim is to consider whether EPA's action was properly based on the evidence then before it. It is undisputed that Bromberg's deposition testimony was not available, or even in existence, at the time EPA approved these TMDLs. The APA does not authorize the Court to judge the wisdom of EPA's decisions in hindsight. Rather, the Court must determine whether EPA acted properly on the basis of the evidence before it at the time it made its decision. Mr. Bromberg's later testimony is irrelevant to this consideration.[21]

### c. Actual Consideration of Seasonal Variations

The Court must consider whether the administrative record contains evidence sufficient to justify EPA's decision that the reservoir TMDLs satisfied the seasonal variation requirement. The Court finds that it does.

■ Defendants provide three primary sources of evidence in the record, which the Court concludes provide an ample basis for EPA's decision. *See* AR at 981 (showing calculations performed on the basis of growing-season (summer) data), 1450 & 3090 (describing use of Vollenweider model to provide for greater phosphorus loading during growing season, May to October). Although the evidence on this point is not abundant, the Court cannot say that EPA acted arbitrarily or capriciously in approving the seasonal variation component on this basis.

> "What was done here is they take a five-year average and they do a five-year average to dampen out the variations that occur from year to year, all right? Which is seasonal variability. So in that sense, what this paragraph is describing is taking into account seasonal or annual variability in the data from a given reservoir and calculating in to its critical loading." *Id.*

---

**21.** Although the Court need not reach this issue, defendants observe that plaintiffs have mischaracterized Mr. Bromberg's testimony. Bromberg first remarked in his deposition, "Since the TMDLs were based on an averaged condition, I would say they did not take into account seasonal variations." Defs.' Repl.Br. at 69 (quoting JA at 6343) Subsequently, however, Bromberg clarified that

### 6. Conclusion

For these reasons, the Court finds that EPA's approval of the eight reservoir TMDLs submitted by New York is rationally supported by the administrative record, and the Court will not disturb EPA's determination as arbitrary, capricious, or otherwise not in accordance with law. Plaintiffs' Claim Nine is hereby dismissed with prejudice.

### V. EPA Failure to Approve or Disapprove Ten New York City Reservoir TMDLs

#### A. Clean Water Act

The Clean Water Act grants the courts jurisdiction to review EPA action to the limited extent that "there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2).

On January 31, 1997, New York submitted eighteen proposed reservoir TMDLs to EPA for its approval. *See* AR at 2833. On April 2, 1997, EPA approved the eight TMDLs that are the subject of plaintiffs' Claim Nine, but decided that because "critical loads [were] not exceeded" for the remaining ten reservoirs, "at this time, EPA is not taking action on these 10 Phase I TMDLs." AR at 3082. EPA informed the State that it considered these TMDLs "to be submitted by NYSDEC for informational purposes only, pursuant to § 303d(3) of the Clean Water Act." *Id.* EPA drew this conclusion in spite of the State's clear indication that it was submitting these TMDLs "for USEPA Region II review and approval." AR at 2833.

Plaintiffs' Claim Ten asserts that defendants' decision to classify these ten reservoir TMDLs submitted by the State as "informational," and decline either to approve or disapprove them, breached a non-discretionary duty either to approve or disapprove all TMDLs submitted to EPA for approval. The parties offer competing policy arguments as to whether EPA *should* be allowed to accept such TMDL submissions as "informational," rather than approving or disapproving them. Plaintiffs maintain that EPA's failure to review these proposed TMDLs deprives the State of the ability to incorporate the standards into its water quality management plan, thus defeating its efforts to protect segments that are not now water quality limited, but may be threatened in the future. *See* Pls.' Br. at 53–55. Defendants argue that these TMDLs are valuable for informational purposes, and that— if its hand is forced—EPA might disapprove them and New York might, in turn, decline to submit Phase II TMDLs. *See* Defs.' Br. at 71–72

Plaintiffs contend that EPA's duty to act on a TMDL submission turns on the simple question of whether the relevant waterbody is included in the State's § 303(d) list, a view supported by the plain language of the statute. *See* 33 U.S.C. § 1313(d). Defendants argue that the *intent* of the statute is to require formulation and approval of TMDLs for only those bodies of water that are actually water quality limited. Defendants do not dispute that the ten reservoirs in question are included on New York's § 303(d) list, as approved by EPA, but argue that because none of the reservoirs is technically water quality limited, none is *required* to appear on the § 303(d) list.

Notwithstanding defendants' assertion that EPA was forced to resolve an ambiguity in the CWA through statutory construction, the Court finds that the CWA is unambiguous on this point, and therefore the clear language of the statute must prevail. "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, howev-

er, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778; *see also Skandalis v. Rowe*, 14 F.3d 173 (2d Cir.1994); *Rahim v. McNary*, 24 F.3d 440 (2d Cir.1994); *Himes v. Shalala*, 999 F.2d 684, 689 (2d Cir.1993).[22]

Under *Chevron*, the Court first must inquire whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. *Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778.

The Clean Water Act requires each state to "identify those waters within its boundaries for which the effluent limitations required by section 301(b)(1)(A) and section 301(b)(1)(B) are not stringent enough to implement any water quality standard applicable to such waters," 33 U.S.C. § 1313(d)(1)(A), and "submit to the administrator from time to time . . . for his approval the waters identified and the loads established under . . . this subsection." 33 U.S.C. § 1313(d)(2). The Administrator, in turn, "shall either approve or disapprove such identification and load not later than thirty days after the date of submission." *Id.*

On May 17, 1996, New York State submitted its proposed § 303(d) list to EPA. *See* AR at 1381. Upon receipt thereof, EPA came under a nondiscretionary duty to approve or disapprove the list within 30 days. 33 U.S.C. § 1313(d)(2). On June 28, 1996, EPA approved the list submitted by New York, which included these ten reservoirs, without changes. *See* AR at 1694. Accordingly, these waterbodies were incorporated into New York's water quality management plan. Under § 303(d)(1)(C), New York was obligated to establish TMDLs for these waterbodies and submit them to EPA for approval. *See* 33 U.S.C. § 1313(d)(1)(C). This submission triggered EPA's nondiscretionary duty to approve or disapprove the proposed TMDLs.

EPA concedes that it approved New York's § 303(d) list even though it had "reasonably concluded that these waterbodies were not water quality limited." Defs.' Br. at 70. EPA maintains that it "reasonably decided not to disturb the State's decision to retain these reservoirs on the State's priority list because the State was committed to developing Phase II TMDLs for these waterbodies." *Id.* EPA argues incorrectly that "[t]he CWA does not expressly address the specific issue of whether the EPA must take action on a TMDL that is submitted for a waterbody that is determined not to be water quality limited but is still listed on the state's WQLS list." *Id.* at 70–71.

In prescribing EPA's duties with respect to the waterbodies on a State's § 303(d) list, the Clean Water Act draws no distinc-

---

**22.** Because EPA is the federal agency entrusted with administration and enforcement of the Clean Water Act, *see* 33 U.S.C. § 1251(d), "EPA's reasonable interpretations of the Act are due deferential treatment in the courts." *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co.*, 12 F.3d 353 (2d Cir.1993) (citing *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778) (deferring to EPA's "entirely reasonable" interpretation of the CWA). The Supreme Court has specifically remarked that the courts "need not find that [EPA's interpretation of the CWA] is the only permissible construction that EPA might have adopted but only that EPA's understanding of this very complex statute is a sufficiently rational one to preclude a court from substituting its judgment for that of EPA." *Id.* (quoting *Train*, 421 U.S. at 75, 95 S.Ct. 1470). Likewise, EPA's interpretation of its own regulations must be given substantial deference. *See Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381; *Arkansas v. Oklahoma*, 503 U.S. at 112, 112 S.Ct. 1046; *Good Samaritan Hosp. Regional Medical Center v. Shalala*, 85 F.3d 1057, 1062 (2d Cir.1996).

tion between those segments that are actually water quality limited, and those that are not. Had EPA wished to alter New York's proposed § 303(d) list, it had the opportunity to do so before approving it. However, having approved the list in its entirety—including the 10 reservoir segments in question—EPA triggered a duty to approve or disapprove the proposed TMDLs submitted by the State for each of these segments.

■ Although defendants seize on the Court's suggestion in *NRDC II* that requiring EPA to act on proposed TMDLs for waterbodies that are not actually water quality limited " 'may be too wooden a reading of the Act,' " Defs.' Br. at 71 (quoting *NRDC II*, 30 F.Supp.2d at 383), it is clear that EPA may fill gaps in the Act only where such gaps exist. The Court finds that the Clean Water Act unambiguously requires agency action on any proposed TMDLs submitted to EPA for WQLSs included on a State's § 303(d) list. *Cf. Pronsolino v. Marcus*, 91 F.Supp.2d 1337 (N.D.Cal.2000) ("[T]he sole import of placing a river or water on a Section 303(d) list was that it would trigger the TMDL requirement.") In requiring EPA to perform this simple, binary duty, Congress left no room for EPA, or the Court, to define subsets of listed WQLSs that deserve differential treatment. If EPA wished not to review TMDLs for these waterbodies, it had an opportunity to disapprove their inclusion on the § 303(d) list.

At that earlier stage, EPA could have argued that these waterbodies were not water quality limited, and should be omitted from the list and exempted from TMDL development.[23] Having approved their inclusion on New York's § 303(d) list, however, EPA missed its opportunity to pass upon the wisdom of approving TMDLs for these segments.

EPA is misplaced in its reliance upon § 303(d)(3), which provides that "[f]or the specific purpose of developing information, each State shall identify all waters within its boundaries which it has not identified under paragraph (1)(A) and (1)(B) of this subsection and estimate for such water the total maximum daily load ... for those pollutants which the Administrator identifies ... and for thermal discharges." 33 U.S.C. § 1313(d)(3). This subsection directs the states to develop "informational" TMDLs *only* for those waterbodies not identified under §§ 303(d)(1)(A) –(B), *i.e.,* not on a state's § 303(d) list. EPA's attempt to shoehorn the 10 reservoir TMDLs into this category is unpersuasive. EPA cannot credibly argue that these segments fall within the strict parameters of § 303(d)(3). The Clean Water Act is clear that a proposed TMDL submitted for a waterbody on the State's § 303(d) list requires action by EPA, and the reservoir TMDLs are no exception. Accordingly, EPA is ordered to approve or disapprove these ten proposed TMDLs within 30 days of the entry of judgment.[24]

---

23. Such an argument would not have been convincing, however, given EPA's own definition of "water quality limited segment." *See* 40 C.F.R. § 130.20(j). EPA defines a WQLS not as a segment that presently fails to meet water quality standards, but as "[a]ny segment where it is known that water quality does not meet applicable water quality standards, and/or is not expected to meet applicable water quality standards, even after the application of the technology-based effluent limitations required by sections 301(b) and 306 of the Act." *Id.; see also* "National Clarifying Guidance for 1998 State and Territory Section 303(d) Listing Decisions," JA at 6898. Indeed, contrary to the position it now takes, EPA in 1997 urged states to *"include a water-*

*body on the 1998 Section 303(d) lists if the waterbody presently meets an applicable water quality standard, but is expected to exceed that standard before the next list submission deadline, i.e., April 2000. Id.* at 6899 (emphasis in original).

24. The Court is aware that EPA's proposed revisions to its TMDL regulations, published in August 1999 and expected to be made final later this year, contemplate "drop[ping] the requirement that polluted water lists include 'threatened' waters that are expected to become polluted in the near future." Fox Letter. While defendants' arguments in opposition to plaintiffs' Claim Ten clearly anticipate such a development, the Court is guided by

## B. Administrative Procedure Act

In Claim Eleven, plaintiffs raise an APA challenge to the same failure of EPA to act upon the ten reservoir TMDLs discussed above. This claim must be dismissed as moot, as it duplicates a claim upon which plaintiffs have already been granted relief under the citizen-suit provision of the CWA. It is well-established that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *see also, e.g., Kingman Park Civic Assoc. v. EPA*, 84 F.Supp.2d 1, 9 (D.D.C.1999) (dismissing APA claims as to agency action properly reviewable under CWA). The APA authorizes judicial review only of agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Because plaintiffs have been granted relief on their parallel CWA claim, the Court dismisses Claim Eleven as moot. *See, e.g., Oregon Natural Resources Council v. United States Forest Serv.*, 834 F.2d 842, 851 (9th Cir.1987) ("Where the plaintiffs may otherwise proceed under the citizen suit provision, they should not be allowed to bypass the explicit requirements of the [CWA] ... through resort to ... the APA."); *American Canoe Ass'n, Inc. v. EPA*, 30 F.Supp.2d 908, 922–23 (E.D.Va. 1998) ("Since claim 4 [under the CWA] survives, claim 5, pleading in the alterna-

the regulations now in effect, and defendants must abide by this Order, notwithstanding imminent changes to the governing regulations. The Court will not countenance any attempt by defendants to delay action until the new regulations are finalized, in hopes of using the regulations as a defense for inaction. The Court wishes to be unequivocal that failure to approve or disapprove these ten proposed TMDLs within 30 days of the entry of judgment will be construed as contempt of this Order.

25. While this claim is mooted by the Court's holding that EPA's failure to approve or disapprove the 10 proposed TMDLs breaches its clear, nondiscretionary duty under the CWA, the Court would almost certainly reach the same result under the APA, as EPA's decision not to act runs afoul of both § 706(1) and

tive that EPA's failure to act is an abuse of discretion reviewable under the Administrative Procedure Act, must be dismissed.") [25]

## VI. EPA Failure to Oversee and Effectuate TMDL Program in New York State

Plaintiffs contend in their Fourth Amended Complaint that EPA's failure, in general, to oversee and effectuate the TMDL program in New York State over the past two decades creates a separate cause of action under both the CWA and the APA. In their final brief, however, plaintiffs concede that Claim Twelve fails to state a cause of action under the CWA, and consent to its dismissal. *See* Pls.' Br. at 58 n. 31 ("Upon further reflection, and in light of [the Court's] November 1998 ruling, Plaintiffs believe that EPA's failure to oversee and effectuate the section 303(d) scheme in New York State properly falls under the Administrative Procedure Act. Accordingly, Plaintiffs have no objection to the dismissal of their parallel claim under the Clean Water Act—Claim 12.") Accordingly, Claim Twelve is hereby dismissed with prejudice.

The Court is left to consider plaintiffs' contention that EPA's overall conduct with respect to the TMDL program contravenes § 706(2)(A) of the APA.[26]

§ 706(2). Although the Court need not engage in detailed analysis of this moot claim, it is likely that EPA acted "not in accordance with law" in contravention of § 706(2) by failing to heed the clear mandate of the Clean Water Act, and unlawfully withheld agency action in contravention of § 706(1) by refusing to approve or disapprove the proposed TMDLs upon expiration of 30 days after their submission by New York State.

26. Although Claim Thirteen of the Fourth Amended Complaint contains an allegation that EPA "withheld or unreasonably delayed agency action" in failing to oversee and effectuate the TMDL program, Fourth Am.Compl. at ¶ 61, plaintiffs appear to have abandoned this argument, which is not taken up in either of their briefs. *See* Pls.' Br. at 64 n. 32 ("In

In *NRDC II*, the Court faulted EPA for failing to explain sufficiently "why the claim fails to state a viable cause of action." The Court further held that "EPA's assertion that the claim is merely duplicative of plaintiffs' other claims is clearly incorrect." Plaintiffs concede that the claim "incorporates by reference the facts from Plaintiffs' other claims in this case," but argue that "it also stands alone in the wake of Federal Defendant[s'] widespread and continuing course of conduct in contravention of the § 303(d) statute and its implementing rules." Pls.' Br. at 63. While the Court can imagine a situation in which several agency actions, none of which by itself gives rise to an APA claim, might in the aggregate give rise to a claim, plaintiff does nothing to convince the Court that this is such a case. Absent a compelling argument to the contrary, the Court must find that the sum of plaintiffs' unsuccessful claims is itself an unsuccessful claim. While plaintiffs readily concede that "case law for this type of claim is sparse," plaintiffs "*believe* that the sweeping failures of EPA to implement this program in New York over an elongated period of time sets forth a valid cause of action under the APA" *Id.* (emphasis added). As sincere and well-intentioned as plaintiffs' "belief" may be, it does not provide the Court with the authority to adjudicate Claim Thirteen as an independent claim.

Plaintiffs cite two cases for the proposition that agencies may violate the APA "where their patterns of conduct amount to a subversion of the statutory scheme."

the case at hand, Plaintiffs assert that EPA's failure to oversee and effectuate the § 303(d) [program] constitutes conduct that is arbitrary and capricious or otherwise not in accordance with law under the APA. If Your Honor reconsiders it is necessary, Plaintiffs could amend their complaint to formally add an 'unreasonable delay' prong to Claim 13.")

27. Indeed, as defendants note, the *Cutler* court actually rejected a broad challenge to FDA's alleged "nonenforcement" of its duties. *See* Defs.' Repl.Br. at 26–27 (citing *Cutler,* 818 F.2d at 894).

Pls.' Br. at 64 (citing *Cutler,* 818 F.2d at 895; *NRDC v. EPA,* 595 F.Supp. at 1269–70). The Court finds the offered precedent inapposite for two reasons. First, the Court does not doubt that a "pattern of conduct" might amount to a violation of the APA, assuming said conduct runs afoul of § 706. The operative question is whether such a pattern gives rise to an independent cause of action where plaintiffs have sought relief separately for each element of the supposed pattern. Neither of the cases cited by plaintiffs sheds light on this question. Second, each of these cases appears to involve the withholding of agency action required by a particular statutory provision, more analogous to plaintiffs' Claims Six and Seven than to Claim Thirteen.[27]

In *Lujan v. National Wildlife Federation,* the Supreme Court held that judicial review of agency action necessarily follows a "case-by-case approach." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 894, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).[28] Noting that this was "understandably frustrating to an organization such as respondent, which has as its objective across-the-board protection of [natural resources]," the Court lamented that this was the "traditional, and ... normal, mode of operation of the courts." *Id.* Except where Congress "explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specif-

28. "Respondent alleges that violation of the law is rampant within this program—failure to revise land use plans in proper fashion, failure to submit certain recommendations to Congress, failure to consider multiple use, inordinate focus upon mineral exploitation, failure to provide required public notice, failure to provide adequate environmental impact statements. Perhaps so. But respondent cannot seek *wholesale* improvement of *this program* by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan,* 497 U.S. at 891, 110 S.Ct. 3177.

ic 'final agency action' has an actual or immediately threatened effect." *Id.* (quoting *Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 164–166, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967)). While such an approach "is assuredly not as swift or as immediately far-reaching a corrective process as those interested in systemic improvement would desire[,] ... more sweeping actions are for the other branches." *Id. See also American Disabled for Attendant Programs Today v. HUD,* 170 F.3d 381, 389 (3d Cir.1999) (rejecting plaintiffs' broad-based claim under the APA: "We are not dealing with a challenge to specific HUD conduct; instead, we are faced with a broad-based attack on HUD's investigative and enforcement scheme.")

Thus, under *Lujan,* plaintiffs must address EPA's failures item by item, as they have done in their other claims. They cannot state a claim for relief by simply alleging that EPA has generally done a poor job of administering the TMDL program, whether or not that is true. A claim that alleges that an agency has run afoul of its mandate in countless different ways begs the question of remedies. Plaintiffs may envision a scenario in which the Court expresses general dissatisfaction with EPA's oversight of the TMDL program, and opts to micro-manage the program itself. But the APA does not contemplate prospective remedies of this sort. Even assuming, *arguendo,* that the Court could provide relief on a claim of this type, it would be required under the APA to parse out each individual allegation and compel or vacate a specific agency action, as appropriate. In effect, the Court would be required by the APA to divide Claim Thirteen into its component parts and contemplate the appropriate relief for each. This, of course, would be redundant with the Court's adjudication of plaintiffs' other APA claims.

Nonetheless, in reviewing the administrative record, the Court finds nothing to support a finding that EPA acted arbi-

trarily, capriciously, or otherwise contrary to law in its present effectuation and oversight of the TMDL program, bearing in mind that its past conduct is beyond the reach of the APA. As the Court is satisfied that EPA's present management of the TMDL program generally complies with the CWA, plaintiffs are not entitled to relief on this claim. The only relief the Court has the power to provide is to compel EPA's compliance with the CWA, a statute with which the Court finds EPA is already complying.

## CONCLUSION

For the reasons stated above, plaintiffs' Claims Six and Seven are hereby DISMISSED without prejudice to refiling based on future developments. Claims Nine, Twelve, and Thirteen are DISMISSED with prejudice. Claim Eleven is DISMISSED as moot. Judgment shall enter in favor of plaintiffs on Claim Ten, and defendant EPA is hereby ordered to approve or disapprove the ten New York City reservoir TMDLs submitted by New York State on January 31, 1997, within 30 days of the entry of judgment.

The Court shall retain jurisdiction over this action for the limited purpose of entertaining any party's motion for fees and costs, which shall be made no later than fifteen (15) days after judgment enters, with opposition due within ten (10) days thereafter.

**SO ORDERED.**